UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 15 2008

MOLLY C. DWYER, CLERK OF COURT
U.S. COURT OF APPEALS

| | |
|---|---|
| WARNER BROTHERS INTERNATIONAL TELEVISION DISTRIBUTION, a division of TIME WARNER ENTERTAINMENT COMPANY, L.P.,<br><br>           Plaintiff - Appellee,<br><br>V.<br><br>GOLDEN CHANNELS & CO.,<br><br>           Defendant - Appellant. | No.   05-55374<br>D.C. No.  CV-02-09326-MMM<br>Central District of California, Los Angeles<br><br><br>**MANDATE**  |

| | |
|---|---|
| WARNER BROTHERS INTERNATIONAL TELEVISION DISTRIBUTION, a division of TIME WARNER ENTERTAINMENT COMPANY, L.P.,<br><br>           Plaintiff - Appellant,<br><br>V.<br><br>GOLDEN CHANNELS & CO.,<br><br>           Defendant - Appellee. | No.   05-55421<br>D.C. No.  CV-02-09326-MMM<br>Central District of California, Los Angeles<br><br><br>**MANDATE** |

The judgment of this Court, entered 4/15/08, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

Molly C. Dwyer
Clerk of Court

By: Gabriela Van Allen
Deputy Clerk

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

WARNER BROTHERS INTERNATIONAL
TELEVISION DISTRIBUTION, a division
of TIME WARNER ENTERTAINMENT
COMPANY, L.P.,
             *Plaintiff-Appellee,*

v.

GOLDEN CHANNELS & CO.,
             *Defendant-Appellant.*

No. 05-55374
D.C. No.
CV-02-09326-
MMM

WARNER BROTHERS INTERNATIONAL
TELEVISION DISTRIBUTION, a division
of TIME WARNER ENTERTAINMENT
COMPANY, L.P.,
             *Plaintiff-Appellant,*

v.

GOLDEN CHANNELS & CO.,
             *Defendant-Appellee.*

No. 05-55421
D.C. No.
CV-02-09326-
MMM
OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
May 7, 2007—Pasadena, California

Filed April 15, 2008

Before: John T. Noonan, Andrew J. Kleinfeld, and
Richard A. Paez, Circuit Judges.

3971

3972      WARNER BROTHERS INT'L v. GOLDEN CHANNELS

Opinion by Judge Kleinfeld

## COUNSEL

David M. Rice, Carroll, Burdick & McDonough, LLP, San Francisco, California, for the appellant.

Frederic D. Cohen, Horvitz & Levy, LLP, Encino, California, for the appellee.

## OPINION

KLEINFELD, Circuit Judge:

This is a breach of contract case, involving breach of an agreement between a cable television broadcaster and a company licensing programming.

### Facts

This is an appeal from a judgment following a bench trial. We take the facts from the findings and exhibits except as otherwise explained.

Starting in 1990, Warner Brothers licensed television programming to Golden Channels, a cable television company in Israel. Golden was associated with two other cable television companies, and the three together, as Israel Cable Programming Ltd., coordinated their operations. For almost a decade, Warner and Golden made agreements lasting about one year. None of those are at issue. This case arises out of a contract made in 1999.

The Israeli television market changed in January 1999, when the government licensed a satellite television broadcaster. Satellite television subjected Golden to competition and opened up different possibilities, positive and negative, for Warner.

Warner and Golden accordingly changed their arrangement. Instead of year to year agreements, they made a contract for 30 months. Under the new agreement, Golden had less power to pick and choose programs, and had to buy at least the minimum amounts specified in the contract of various types of programs, both new and popular shows, and old reruns. The contract commenced December 1, 1999 and ended May 31, 2002. Golden was obligated to spend $5 million the first year, $5.5 million the second year, and $3 million the last six months.

During the contract term, to May 31, 2002, Golden was obligated to provide "an irrevocable unconditional draw down letter of credit," for at least $5 million, the form of which was specified in an addendum. A letter of credit creates "an absolute, independent obligation and payment must be made upon presentation of the proper documents regardless of any dispute between the buyer and seller concerning their agreement."[1] Like a Travelers Check (which is a letter of credit), it enables international business to be done safely and securely because the vendor need only rely on the financial strength of the issuing bank, and not on the financial strength and willingness to pay of the vendee.[2]

Golden maintained the letter of credit as required, with its bank. The form was a commitment from the bank that the beneficiary, Warner, could draw funds up to $5 million, once or in multiple drafts, by presenting sight drafts to the bank,

---

[1] *First Empire Bank-New York v. FDIC*, 572 F.2d 1361, 1366 (9th Cir. 1978); *see also Murphy v. FDIC*, 38 F.3d 1490, 1501 (9th Cir. 1994).

[2] *Murphy*, 38 F.3d at 1501.

which had a branch in Los Angeles. The sight drafts were in the form, "[p]ay on sight to the order of Warner Bros. International Television Distribution . . . the sum of $___," to be signed by an authorized signatory for Warner. The letter of credit was to expire in one year, but would be automatically extended at each one year anniversary unless terminated with at least 60 days notice. The letter issued by the bank ran from July to July, with notice of cancellation to be given in May. As a practical matter, this means that $5 million of Golden's credit line at the bank was tied up so long as the letter of credit remained in effect, and Warner could in substance write checks on an account of $5 million.

Another part of the 1999 contract was that Warner could "at its sole discretion" extend the term for a second 30 month period, so that it would end November 30, 2004 instead of May 31, 2002, by giving notice by September 1, 2001. If Warner extended the term, Golden was obligated to pay Warner a $500,000 extension option fee, and "minimum spend" amounts of $3 million for the first 6 months, then $7 million and $7.5 million respectively for the subsequent two years.

But in the 1999 contract, Warner and Golden expressly did not agree to maintain the letter of credit in place during the extension. Instead, they agreed that the $5 million letter of credit would be in place during the initial term "only." The closest they got to any agreement regarding security for a subsequent term was that they would "discuss" it. Here is the text of the entire paragraph regarding the letter of credit if Warner chose to exercise its option to extend the contract for a second term:

13.7    The Letter of Credit referred to in clause 13.8 above shall be in place from 19 July 1999 to 31 May 2002 only. If Licensor [Warner] intends to exercise the Extension Option under clause 14.1 Licensee [Golden] agrees to discuss with Licensor appropriate security to

be given in respect of License Fees due in years 3B – 5.

Golden's business began to suffer during the initial term, perhaps because of the new competition from satellite television. Golden nevertheless continued to maintain the letter of credit in place, so Warner was fully secured regardless of Golden's declining financial strength.

In June 2001, Warner exercised its option to extend the term of the license agreement through November 30, 2004. Subsequently, in August of 2001, Golden told Warner it could not pay the quarterly licensing fee due on September 1, 2001. In September, Golden asked Warner to renegotiate the agreement, principally to lower licensing fees. Warner could, of course, have refused, but it didn't. The contract provided that Warner could "at its sole discretion" suspend delivery of programs, terminate the agreement, or both, if Golden missed a payment, and Golden did pay less than it owed. But Warner did not find it in its interest to exercise its right to terminate at that time. Instead, Warner agreed to continue to supply programming for a lower fee than it had agreed upon, while the parties negotiated, reserving its right to demand the full amounts required under the contract if negotiations were not successful.

Negotiations trundled along, over email, letter exchanges, and in meetings, even though the parties had not agreed to appropriate security for an extension and had not agreed on much of anything else. In October, the parties discussed what to do about the letter of credit if the term was extended. The parties were still performing under the initial term of the contract, although the second term would begin June 1 pursuant to Warner's exercise of its option to extend the previous June.

Here is where the findings of fact and the evidence we can find in the record diverge. The trial judge found that Warner was adamant that it would not negotiate unless the letter of

credit was kept in place. But all we can find in the evidence
is that Warner was adamant that any modified contract they
negotiated would have to keep the letter of credit in place.
Warner's negotiator testified that he said "the only basis on
which Warner would contemplate renegotiating the deal
would be in the circumstances that we would not review the
letter of credit and it would remain in situ throughout not just
the five-year term per the agreement but also any extended
term as a result of the negotiation." Warner sent an email con-
firming what had been said at the meeting. One of Warner's
points in the confirming email was that it was "absolutely crit-
ical" that "the [letter of credit] remains in situ throughout the
term of the deal with the final year being a draw-down on that
[letter of credit]." We deal with this possible discrepancy
between the evidence and the findings of fact below, in the
analysis.

Golden did not immediately say whether it would accept
this proposal, though it spoke to it some months later. Warner
continued negotiations, even though it had no agreement that
the letter of credit would remain in place during the extension
term.

The contract had the usual clause limiting changes to
changes put in writing and agreed to by both parties: "[t]he
terms of this Agreement may be altered only by written agree-
ment of the parties' properly authorised representatives."
There was no such written agreement to alter the terms,
regarding the letter of credit running through May 31, 2002
"only" or anything else.

Negotiations continued through 2002, even though no writ-
ten agreement had been made regarding appropriate security.
Basically, Golden wanted lower fees, and Warner wanted to
sell more programming and not risk losing viewers by a
change in who broadcast its programs. Throughout the negoti-
ations, Warner suggested that there might be some give on

price, but was adamant that the $5 million letter of credit would have to remain in place during any new deal.

While these negotiations were going on, Golden allowed the bank to renew the letter of credit in May of 2002, so the letter of credit secured Warner through July 2003. This date ran over a year beyond what Golden promised to provide in the 1999 contract they had signed. Thus Golden caused Warner to remain secure as negotiations proceeded.

In August of 2002, Golden responded to Warner's demand made for the last several months that the $5 million letter of credit remain in place during the second 30 month period. Golden told Warner that it would maintain the letter of credit through the extension term only after the completion of a merger that it was engaged in with two other cable television companies, and only for a reduced amount based upon what would be a reduced price:

> Cable companies will be able to provide [a Letter of Credit] for movies and series contracts only after the completion of the merger between them. . . . The amount of the [Letter of Credit] will be reduced according to the new contract prices.

Despite this explicit rejection of the requirement on which Warner had been adamant, Warner continued to negotiate, though Warner evinced no give on its demand for a full $5 million of security by letter of credit.

Things came to a head in November, a few months into the second term. Warner's negotiator in London emailed Warner's executive in Los Angeles that Golden had "blinked" and "realises we are prepared to play hardball." The parties negotiated in London with no success and scheduled a conference call for November 19. Meanwhile, Warner issued a notice of default pursuant to the terms of the contract on November 15, 2002. This notice was the "hardball." The contract provided

for default for either of two reasons, failure to maintain the letter of credit in place until May 31, 2002 "only," or unpaid fees:

19.2   In the event that:

        19.2.4   a letter of credit complying with the terms of clause 13.4 is not delivered by the due date under this Agreement and Licensor gives Licensee written notice that such letter of credit has not been delivered and further the letter of credit is not delivered within fourteen (14) days after the date of such written notice;

        19.2.2   the Initial Fee, Extension Option Fee or any License Fee instalment is not paid on the due date under this Agreement and Licensor gives Licensee written notice that payment must be made and further the payment is not made within fourteen (14) days after the date of such written notice

        then Licensor shall (in each case) be entitled (at its sole discretion) to either suspend delivery of the Programs pending compliance and/or terminate this Agreement.[3]

Warner sent Golden two communications the same day. It sent a letter pursuant to 19.2.2 claiming an entitlement to $2,809,790 in arrears, and demanded that Golden tender pay-

---

[3]The numbers on the clauses, 19.2.2 following 19.2.4, make no sense, and there are only two sub-parts of 19.2. The numbering oddity makes no difference.

ment within 14 days, or else be subject to suspension of delivery of programs, termination of the contract, or both. Warner further "reminded" Golden that in two weeks it would owe another $2,811,961.50. Warner did not claim any breach or default with respect to the letter of credit or mention the other clause, 19.2.4. Warner's letter was couched exclusively in terms of the second termination clause, 19.2.2, for missed payments, and not the first, 19.2.4 for failing to maintain a letter of credit for $5 million.

On the same day as the letter, Warner sent Golden an email with quite a different tone. Warner's email thanked Golden's representative for flying to London to negotiate, stated that Warner would not immediately draw down the letter of credit, and explained the simultaneous letter by saying that it had merely "set the 14 day clock running" by issuing the breach notice. "Obviously we hope that we will have successfully concluded negotiations prior to the end of this period and as such no further action would be required on this." By now it had been clear for several months that Golden did not propose to maintain a $5 million letter of credit during the extension term, and Warner proposed to insist on it.

At this point, Golden faced termination in December, had not agreed with Warner upon new terms, and had a letter of credit that would be outstanding until the following July. The contract had obligated Golden to keep a letter of credit in place until May 31 2002 "only," the bank ran the letters of credit from July to July, and by not cancelling with the bank while negotiations were going on, Golden had allowed the letter of credit to run until July 2003. Golden proposed to pay and be done with it.

Golden responded to the letter and email on November 26, characterizing Warner's notice of default as a decision by Warner to "unilaterally and without good faith [ ] terminate the negotiations . . . ." Golden also noted a number of points it had made that Warner had not responded to, questions it

had not answered, and claims unexplained by Warner. Golden also disputed the calculation by a few hundred thousand dollars and proposed to pay Warner by its calculation, $5,083,301, not Warner's for $5,621,751. The difference, $538,450, constitutes 89 hours of rerun programming that Warner had not yet delivered to Golden because Golden had not yet told Warner which titles it wanted. Golden immediately paid the $83,301 cash that it calculated it owed on top of the $5 million secured by the letter of credit. Golden then requested the return of the letter of credit. Golden wrote,

> According to section 13.7 of the Agreement, the [Letter of Credit] shall be in place until 31 May 2002 only. Based on the assumption that the Amendment shall be executed, we have prolonged the period of the [Letter of Credit] delivered to Warner. Since (as mentioned in your letter of November 15, 2002) Warner has decided that no such Amendment shall be executed and pursuant to section 13.7 of the Agreement, we hereby request Warner to return the [Letter of Credit] to us immediately.

In a letter a few days later, Golden proposed that an escrow agent be used to collect the money from Golden and the letter of credit from Warner and exchange them so that Warner would get the full $5,083,301. The record does not show why Golden preferred to exchange the letter of credit for $5 million cash, so we do not know whether it had something to do with Golden's ongoing merger, bank fees (the bank charged Golden $50,000 a year as a fee for keeping the letter of credit in place), not burdening its line of credit during subsequent months, or some other reason. The escrow arrangement would give Warner $5 million cash in exchange for the $5 million letter of credit. The record also does not show why Warner would not be indifferent between the two forms of payment, $5 million by sight draft on the letter of credit, or $5 million cash.

Warner concluded that more negotiations would be fruitless, so on December 9, 2002 it told Golden that it was terminating the contract, stating that Golden "materially breached the License Agreement by failing to pay license fees when due." That day it also drew down the entire $5,000,000 on the letter of credit and sued Golden to collect money claimed on top of the $5,000,000. Golden responded by issuing its own termination letter on January 31, 2003. "Among other things," Golden asserted that Warner materially breached the License Agreement by "wrongfully drawing upon the letter of credit" and by "improperly declaring [Golden] to be in default." Golden said that it was "entitled to continue [to] broadcast the inventory of programs already paid for through April 20, 2004." Golden then counterclaimed in Warner's suit.

The case was tried to the bench. There is no finding of fact explaining why Warner insisted on drawing down the letter of credit instead of taking the identical amount in cash through an escrow, or why Golden insisted on return of the letter of credit in exchange for the identical amount of cash through an escrow. In its conclusions of law, the district court concluded that whether Golden had breached depended on whether its demand for return of the letter of credit constituted a demand for return of security, which would be proper under California law, or a tender subject to a condition Warner was not obligated to satisfy, which would not be a valid tender of performance under Civil Code § 1504. The district court did not find an inadequacy of the amount of Golden's tender, even though it varied from Warner's demand because of the disputed charge for some reruns.

The court concluded that the tender was improperly conditioned on return of the letter of credit, on the theory that Golden was equitably estopped from denying that it had given the letter of credit as security at least through May 2003. The theory for the estoppel was that Golden's renewal of the letter of credit in May 2002 had misled Warner into continuing negotiations, because Golden knew of Warner's adamant insistence

that the letter of credit had to remain in place through the second term of the contract (November 2004). Golden's silence, when it renewed the letter of credit, was the misleading act, causing Warner to believe that Golden had agreed that this should be the amount of security for the second term.

The court concluded that Golden's November 26, 2002 offer was not proper, not because the amount was inadequate, but because it was "subject to conditions [that Warner] is not obligated to satisfy." The "condition" was the return of the letter of credit. Thus the November 26, 2002 offer was considered a "conditional" offer, which "does not constitute performance under Cal. Civ. Code § 1504." Under this approach, Warner had not breached.

In the alternative, based on much the same reasoning, the court also concluded that Golden entered into an implied-in-fact contract with Warner that "the appropriate security to be given" for at least some of the extended contract term would be the $5,000,000 letter of credit.

As for damages, the court concluded that Warner was entitled to both past amounts due and future "benefit of the bargain" damages for future sales to Golden, to November 2004. The court found that Golden acted in "bad faith" and made an anticipatory repudiation of the contract when it conditioned payment of the $5 million to Warner on return of the letter of credit. The court awarded Warner damages of $19,315,960.

### Analysis

### I.  Breach

Golden argues that it did not breach the contract by demanding return of the letter of credit. The district court concluded that when Golden let the letter of credit renew past the date in the 1999 contract to cover the next year, knowing that Warner refused to negotiate unless the letter of credit

remained in effect, Golden implied an agreement to keep it in effect through the second term of the contract, and was estopped from denying that it had agreed to keep the letter of credit in effect.

In light of the findings of fact and the words of the contract the parties signed, the conclusions of law (which are not reviewed under the highly deferential "clearly erroneous" standard)[4] are problematic. First, these were sophisticated parties on both sides. Second, Warner exercised its option to extend the contract for a second term before the letter of credit was renewed, so it could not have relied on the later renewal for its decision to extend. Third, the contract could not have said more clearly that the letter of credit was agreed upon to May 2002 "only" and that any changes would have to be in writing. Fourth, when Golden subsequently suggested that the security during the second term would have to be lower, Warner plainly rejected this proposal, but just as plainly, Warner did not claim that Golden had already agreed to the $5 million letter of credit through the second term. Fifth, Warner never said that it would not negotiate without the letter of credit in place, just that having the letter of credit for $5 million in place would be a *sine qua non* for agreement on whatever reduced price and other terms it might agree to for the extension period.

Golden's theory would be stronger had it sent a reservation of rights letter in May 2002 when it renewed the letter of credit, telling Warner "we do not agree to maintain this letter of credit for any fixed duration and may withdraw it at any time if negotiations do not satisfactorily conclude." Warner's theory would be stronger if it had sent a letter in response to Golden's proposal for a reduced amount of security saying "we construed your renewal of the letter of credit in May as an agreement to maintain it through the second term, and

---

[4]*Bank of New York v. Fremont Gen. Corp.*, 514 F.3d 1008, 1014 (9th Cir. 2008).

would not have continued negotiations had we not been misled."

There are no such reservations of rights or claims in any letters, emails or oral communications to which the parties have directed our attention. All we have is a 1999 contract agreeing to a letter of credit for $5 million through May 2002 "only," an agreement to "discuss" security for a second term, an exercise by Warner of its option for a second term prior to any renewal or agreement regarding the letter of credit, plenty of discussion, and a failure to agree.

[1] The negotiations took place both before the first term ended, and during the second, renewal term. The contract Golden had signed obligated it to maintain an irrevocable letter of credit to May 31, 2002 "only," and it did what it had promised. Addressing Warner's extension contract, the contract Golden and Warner signed agreed to "discuss . . . appropriate security." They discussed it. The common sense of the deal and the use of the word "security" means that the letter of credit was intended by the parties as security, to secure the cash payments Golden would be obligated to make.

[2] California law states that if all the tendering party demands as a condition of its tender is return of its "security," as long as an agreement between the parties does not say otherwise, that condition does not invalidate the tender.[5] Anyone paying off a promissory note gets the original mortgage or deed of trust back when they pay off the note,[6] just as anyone who has pledged something tangible as security gets it back when they pay the secured obligation.[7] That is why someone who pawns a violin gets it back from the pawnshop when they pay the loan the pawnshop extended to them. The letter of

---

[5]Cal. Com. Code § 9102 et seq.

[6]*Berry v. Bank of Bakersfield*, 177 Cal. 206 (1918); *Bell v. Bank of Cal.*, 153 Cal. 234 (1908).

[7]*See People v. MacArthur*, 142 Cal.App.4th 275, 281 (2006).

credit was worth more than the usual pawned violin, but the principle is the same. The findings and briefs, as explained above, leave us in the dark about why Golden wanted the letter of credit back in exchange for cash, and about why Warner wanted to draw down the letter of credit instead of taking cash, but we do not need to know, because the letter of credit was nothing but security that was in effect to May 31, 2002 "only."

[3] The district court's theory that Golden was estopped from denying that it had agreed to extend the irrevocable letter of credit "at least through May 2003" errs, because estoppel requires reasonable reliance on a misleading communication upon which the victim was intended to rely.[8] We are unable to see how there could be reasonable reliance on the unmade promise to extend the letter of credit, in the face of contract language limiting it to May 2002 "only," a clause saying any changes had to be in writing, and no communication suggesting that Golden intended Warner to think it had agreed on keeping the $5 million letter of credit in place or that Warner thought Golden had so implied. There was no misleading communication. If Warner wanted to know what Golden meant to communicate, or if it meant to communicate anything by allowing renewal of the letter of credit, it could have asked. One is reminded of Metternich's remark upon learning of Talleyrand's death, "I wonder what he meant by that?"[9]

The district court's other theory for breach was that the parties created an implied contract that would maintain an irrevocable letter of credit through the end of the second term, November 2004. The basis for this theory was Golden's knowledge of Warner's adamant insistence that this would

---

[8]*Robinson v. Fair Employment & Hous. Comm'n*, 2 Cal.4th 226, 244-45 (1992); *City of Long Beach v. Mansell*, 3 Cal.3d 462, 489 (1970).

[9]Nigel Rees, Brewer's Famous Quotations 452 (Weidenfeld & Nicolson 2006).

have to be agreed upon for the extension term. The district court in its conclusions of law described Warner's position as a "condition Warner placed on the renegotiation," but as explained above, the evidence and findings of fact support only a conclusion that Warner would not modify other terms unless the full $5 million letter of credit was maintained, not that it would not negotiate unless the letter of credit was first agreed to. Warner cannot possibly have meant, as the district court appears to conclude, "there will be no second term and no discussion about a second term unless you agree to keep the $5 million letter of credit in place." The reason why this could not have been a condition for negotiation or extension is that Warner exercised its option to extend when all it had was a promise to keep the letter in place to the end of the first term "only," and to "discuss . . . appropriate security" for the renewal term. Warner renewed in 2001 and took its chances on whether the agreed to discussion would be fruitful.

[4] Mutual assent is essential to an implied contract, the distinction from an express contract being merely that the promise is implied by conduct rather than expressed in words.[10] The district court correctly pointed out that section 13.7 of the contract, the letter of credit section, did not say that any subsequent agreement would have to be memorialized in writing, but section 21.2 says "the terms of this agreement," which includes section 13.7, may be altered only by written agreement. Therefore, contrary to the district court's conclusion, the words of the express contract, requiring that modifications be in writing and that the letter of credit extend to May 2002 "only," and the course of negotiations, do not permit an implication that Golden at any time agreed to keep the $5 million letter of credit in place through November 2004.

[5] Thus we are unable to conclude that Golden breached its contract, under the 1999 written contract, a contract by

---

[10]*Chandler v. Roach*, 156 Cal.App.2d 435, 440-441 (1957); *Silva v. Providence Hospital of Oakland*, 14 Cal.2d 762, 773 (1939).

implication, or because of estoppel when it demanded return of its $5 million letter of credit in exchange for $5 million in cash.

But that is not the end of the case. Warner had exercised its option to extend the contract through November 2004. That was the basis for the district court's award of damages for all the money Warner would have made had the contract been performed until November 2004. The parties carried out their promise to "discuss" what might be "appropriate security" for the renewal term. They never agreed on an "appropriate security."

[6] Warner never agreed to anything less than keeping the $5 million letter of credit in place, and Golden never agreed that it would do so. A fair reading of section 13.7 of the contract is that a $5 million letter of credit was an essential term of the contract. The parties had agreed only to "discuss" the appropriate amount of security, but there was an implied condition that Warner would not have to perform if Golden's payments were not secured.[11] Implied conditions are those that "are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention."[12] All past performance by Warner was secured by a $5 million letter of credit. This history, the mount of money at stake, and the use of the word "appropriate," imply that the parties contemplated that security for payment was a "stipulation[ ] which [is] necessary to make a contract reasonable" that California law demands.[13] The language in section 13.7 that Warner would be secured by an amount that after discussion the parties agreed was "appropriate," implied that Warner could not be held to an obligation to supply programming through the second term if payment was not secured, and Golden does not

---

[11]Cal. Civ. Code § 1655.

[12]Id.

[13]Id.

argue to the contrary. Thus, continued performance after May 31, 2002 by both parties was impliedly conditioned on the presence of "appropriate security," the amount and form of which the parties had agreed to "discuss."

[7] After May 31, 2002, all back and forth discussions about the "appropriate" security to be in place for the extension term were offers and counter-offers, attempting to agree on an "appropriate security."[14] Once negotiations broke down between Warner and Golden, and no agreement on the appropriate security for the extension term was made, an implied condition of the contract failed, and with it, the contract ended. Agreement upon and maintenance of appropriate security for payments as they become due was an implied condition of performance. Warner did not excuse non-occurrence of this condition. "Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur."[15] Since the parties had agreed only to "discuss" security, and did, neither breached its promise to discuss it. Failure to agree was not a breach because an agreement to agree is not a contract.[16] Warner did not breach by terminating its performance December 9, and neither did Golden, because "[n]on-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur."[17]

Yet, to reiterate, there was no breach. Neither party had failed to perform its obligations under the contract. Warner supplied all products under the contract, and Golden paid for them. Golden kept the letter of credit in place until May 31, 2002, which is all that it had promised, and after that date

[14] *See Tuso v. Green*, 194 Cal. 574, 581 (1924).

[15] Restatement (Second) of Contracts § 225(2).

[16] *Autry v. Republic Prods.*, 30 Cal.2d 144, 151 (1947); *Vangel v. Vangel*, 116 Cal.App.2d 615, 631 (1953); *Townsend v. Flotill Prods.*, 82 Cal.App.2d 863, 866 (1948).

[17] Restatement (Second) of Contracts § 225(3).

both parties discussed appropriate security. Once those discussions came to an impasse, the contract ended.

[8] Thus Warner was within its rights to terminate its own performance, as it did on December 9, 2002. Warner did not elect to continue supplying programming, and to bill Golden for the unsecured amounts through the extension term. Since the second term of the contract was already running, Warner had been performing its duties to supply programming, and the parties had agreed on the prices of the programming, Warner was entitled to get paid for the programming it had supplied. The district judge did not find any inadequacy of amount in Golden's tender as of the time it was made, and did not find a breach by failure to pay amounts owed as they became due. Neither side breached, they just failed to reach agreement on a new term, and continued performance was conditional on agreement.

The parties also dispute whether there was a bad faith anticipatory repudiation by Golden and whether the pretrial order gave fair notice that Warner would claim expectancy damages based on a theory of anticipatory repudiation. We need not reach these issues because we hold that neither party breached.

We accordingly REVERSE and REMAND so that the district court can make a damages determination based on Warner getting paid whatever was due for the performance it had rendered through December 9, 2002. Each party to bear its own costs.