1

2

E-Filed: 1/18/13

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

11

CENTRAL DISTRICT OF CALIFORNIA

12

13  WARNER BROS. INTERNATIONAL            )  CASE NO. CV 02-09326 MMM (SHSx)
    TELEVISION DISTRIBUTION, a            )
14  division of TIME WARNER               )
    ENTERTAINMENT COMPANY, L.P.,          )
15                                        )  ORDER ON PARTIES' ENTITLEMENT
                                          )  TO DAMAGES ON REMAND
16              Plaintiff,                )
                                          )
17         vs.                            )
                                          )
18  GOLDEN CHANNELS & CO. and             )
    DOES 1 through 10, inclusive,         )
19                                        )
                                          )
20              Defendants.               )
                                          )

21              I.  FACTUAL & PROCEDURAL BACKGROUND

22         The facts of this case are well known to parties.  As a result, the court provides only a brief

23  summary of the relevant factual and procedural background.   Warner Bros. International

24  Television Distribution, a division of Time Warner Entertainment Company, L.P. ("Warner"),

25  is one of the largest distributors of entertainment programming in the international market.

26  Golden Channels & Co. ("Golden"), an Israeli partnership, is a cable television provider that has

27  broadcast cable television programming in Israel since 1990.  On July 13, 1999, Warner and

28  Golden executed a written License Agreement, pursuant to which Warner licensed certain

programming to Golden for a fee.

The original thirty month term of the Licensing Agreement ran from December 1, 1999, to May 31, 2002. The period from December 1, 1999 to November 30, 2000 was denominated Year 1; the period from December 1, 2000 to November 30, 2001 was Year 2; and the period from December 1, 2001 to May 31, 2002 was designated Year 3A. Warner had the option of extending the term of the agreement for an additional thirty months. Periods under the optional extension were designated: Year 3B (June 1 to November 30, 2002); Year 4 (December 1, 2002, to November 30, 2003); and Year 5 (December 1, 2003 to November 30, 2004). On June 5, 2001, Warner timely exercised its option to extend the License Agreement to November 30, 2004.

The agreement provided that either party could terminate the contract if the other materially breached its warranties and did not cure the breach within 30 days after receipt of written notice specifying the breach and demanding that it be cured. On December 9, 2002, Warner sent Golden a letter terminating the License Agreement on the grounds that Golden was in material breach of the contract. Warner filed this action the same day. On February 14, 2003, Golden filed an answer and counterclaims.

The action was tried to the court in January 2004. On September 29, 2004, the court issued findings of fact and conclusions of law, entered judgment for Warner on its breach of contract claims, and awarded damages of $19,315,960.[1] The court concluded that Golden 's November 26, 2002 offer to tender $5,083,301 in cash conditioned on Warner's return of the letter of credit was not valid because it was "subject to conditions [that Warner was] not obligated to satisfy," namely, the return of the letter of credit. Consequently, it found that Warner had not breached the contract, but that Golden had. Alternatively, the court found that Golden had entered into an implied-in-fact contract with Warner that "the appropriate security to be given" for at least some of the extended contract term would be the $5,000,000 letter of credit.

Golden appealed the judgment in Warner's favor on the latter's breach of contract claims.

---

[1] Findings of Fact and Conclusions of Law ("FF/CL"), Docket No. 334 (Sept. 29, 2004); Judgment, Docket No. 335 (Sept. 29, 2004).

2

Golden did not, however, appeal the court's judgment in Warner's favor on Golden's counterclaims, including its unjust enrichment claim for restitution.  On April 15, 2008, the Ninth Circuit reversed, concluding that neither party had breached the contract, and that Golden  was not estopped from denying that it had agreed to keep the letter of credit in effect after the contract term expired.  *Warner Bros. Intern. Television Distribution v. Golden Channels & Co.*, 522 F.3d 1060, 1068-69 (9th Cir. 2008).  The appellate court also concluded that there was no implied contract that required Golden to provide an irrevocable letter of credit as security through the end of the contract's second term.  *Id.* at 1069.

The Ninth Circuit remanded "so that the district court [could] make a damages determination based on Warner getting paid whatever was due for the performance it had rendered through December 9, 2002."  *Id.* at 1071.[2]  The parties dispute the meaning of this direction. Warner takes the position that the mandate requires the court to undertake only one task: to calculate the payments Golden owed to Warner as of December 9, 2002.[3]  Warner asserts that the court already made this determination in its findings of fact and conclusions of law, and that it need not engage in any further analysis of the subject.  Golden counters that the Ninth Circuit instructed the court to determine the amount that would make each of the parties whole as of December 9, 2002, when the contract terminated.[4]  It argues that when that determination is made, Golden , rather than Warner, is entitled to damages, because it actually paid Warner more money than was due for the performance Warner rendered through the date the contract ended.

Pursuant to the court's order, Warner filed its opening brief on April 16, 2012.[5]  Golden

---

[2]Mandate, Docket No. 475 (July 15, 2008).

[3]Joint Status Report Pursuant to Court Order of October 30, 2008, Docket No. 479 (Nov. 24, 2008) at 2.

[4]*Id.* at 6.

[5]Warner Bros.'s Opening Brief in Response to March 22, 2012 Court Order ("Warner Brief"), Docket No. 498 (Apr. 16, 2012).

1  filed a responsive brief on May 21, 2012,[6] and Warner filed a reply on June 11, 2012.[7]

2

3  ## II.  DISCUSSION

4  ### A.    The Scope of the Ninth Circuit's Mandate

5  As a threshold matter, the parties dispute the scope of the Ninth Circuit's mandate on

6  remand, and what it was the Ninth Circuit directed the court to do.  The Ninth Circuit has held

7  that its mandate "limit[s] the district court's 'authority' on remand," and that "if a district court

8  errs by violating the rule of mandate, the error is a jurisdictional one." *United States v. Thrasher*,

9  483 F.3d 977, 982 (9th Cir. 2007) (quoting *United States v. Pimentel*, 34 F.3d 799, 800 (9th

10  Cir.1994)).  In reaching this conclusion, the Ninth Circuit relied on *In re Sanford Fork & Tool*

11  *Co.*, 160 U.S. 247 (1895), which stated:

12  "When a case has been once decided by this court on appeal, and remanded to the

13  [district court], whatever was before this court, and disposed of by its decree, is

14  considered as finally settled.  The [district court] is bound by the decree as the law

15  of the case, and must carry it into execution according to the mandate.  That court

16  cannot vary it, or examine it for any other purpose than execution; or give any

17  other or further relief; or review it, even for apparent error, upon any matter

18  decided on appeal; or intermeddle with it, further than to settle so much as has been

19  remanded. . . .  But the [district court] may consider and decide any matters left

20  open by the mandate of this court. . . ." *Id*. at 255-56.

21  Accordingly, the Ninth Circuit observed, "'a district court could not refuse to dismiss a case when

22  the mandate required it, and a district court could not revisit its already final determinations unless

23

24  _____

[6]Golden Channels's Brief in Response to March 22, 2012 Court Order ("Golden Channels
25  Brief"), Docket No. 502 (May 21, 2012); Golden Channels's Request for Judicial Notice in
   support of Its Brief in Response to the Court Order of March 22, 2012 ("Golden Channels RJN"),
26  Docket No. 503 (May 21, 2012).

27  [7]Warner Bros. International's Reply Brief in Response to March 22, 2012, Court Order
28  ("Warner Reply"), Docket No. 504 (June 11, 2012).

the mandate allowed it.'" *Thrasher*, 483 F.3d at 981-82 (quoting *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995) (citations omitted)).  "Although the doctrine applies to a court's 'explicit decisions as well as those issues decided by necessary implication,' it 'clearly does not extend to issues an appellate court did not address.'" *Id.* (citing *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir. 1989), and *Luckey v. Miller*, 929 F.2d 618, 621 (11th Cir. 1991)); see also *Firth v. United States* 554 F.2d 990, 993-94 (9th Cir. 1977) ("[A] mandate is controlling as to all matters within its compass, while leaving any issue not expressly or impliedly disposed of on appeal available for consideration by the trial court on remand").

"A district court construing a mandate 'may consider the opinion the mandate purports to enforce as well as the procedural posture and the substantive law from which it arises.'" *Weaver v. Palmateer*, Civil No. 99-1045-ST, 2008 WL 4534100, *2 (D. Or. Oct. 2, 2008) (quoting *United States v. Kellington*, 217 F.3d 1084, 1092-93 (9th Cir. 2000)); see also *In re Sanford Fork & Tool Co.*, 150 U.S. at 256 ("The opinion delivered by this court, at the time of rendering its decree, may be consulted to ascertain what was intended by its mandate. . .").  "[T]he ultimate task is to distinguish matters that have been decided on appeal, and are therefore beyond the jurisdiction of the lower court, from matters that have not. . . ." *Kellington*, 217 F.3d at 1092-93.

Here, the Ninth Circuit's mandate stated as follows:

> "We accordingly REVERSE and REMAND so that the district court can make a damages determination based on Warner getting paid whatever was due for the performance it had rendered through December 9, 2002.  Each party to bear its own costs." *Warner Bros.*, 522 F.3d at 1071.

The court did not make clear what damages it thought should be awarded, or on what theory damages should be awarded.  The court must therefore look to the balance of the opinion to divine its intent. See *Kellington*, 217 F.3d at 1093.  The Ninth Circuit observed that the court's original award of damages was based on the fact that Warner had properly exercised its option to extend the contract through November 2004.  *Warner Bros.*, 522 F.3d at 1070.  It concluded, however, that once the parties were unable to agree on "appropriate security" for the extended term, an

implied condition of the contract failed, and the contract ended. *Id.* Stated differently, the court held that because the parties never reached agreement on an implied condition of performance, the contract ended as of December 9, 2002, after the first term of the contract had ended, and the second term had begun.

Warner exercised its unilateral option to extend the contract in June 2001. *Id.* at 1063. Thus, after the contract's first term expired on May 31, 2002, the contract's second term began running the next day. The contract did not require that security be in place as a precondition to commencement of the second contract term; it required only that in the event Warner exercised its option to extend, Golden would "discuss with [Warner] appropriate security to be given in respect of License Fees" due after the initial term. *Id.* at 1063.[8] As a consequence, the Ninth Circuit decided, "there was no breach" so long as the parties continued their negotiations. *Id.* When it became clear, however, that they could not reach agreement on "appropriate security," the court held that Warner was within its rights to terminate performance, as it did on December 9, 2002. *Id.* at 1071.

The crucial language in the Ninth Circuit's opinion, which suggests the proper interpretation of the mandate, followed. The court observed that on December 9, 2002,

> "Warner did not elect to continue supplying programming, and to bill Golden for the unsecured amounts through the extension term. *Since the second term of the contract was already running, Warner had been performing its duties to supply programming, and the parties had agreed on the prices of the programming, Warner was entitled to get paid for the programming it had supplied.* The district judge did not find any inadequacy of amount in Golden's tender as of the time it was made, and did not find a breach by failure to pay amounts owed as they became due. Neither side breached, they just failed to reach agreement on a new term, and continued performance was conditional on agreement." *Id.* (emphasis added).

The italicized language suggests that in the Ninth Circuit's view, because Warner had continued

---

[8]License Agreement, ¶ 13.7.

to provide programming to Golden during the extended contract term, it was entitled to be paid for that programming pursuant to the agreement.  The Ninth Circuit noted that this court had not made a finding that Golden's payments through December 9, 2002 were inadequate or contrary to the contract.  This is correct, since the court's damages calculation was based on the view that due to Warner's exercise of its option to extend, the contract term ended in November 2004, and Warner was entitled to recover the amounts it would have been paid during that period "had Golden properly performed the contract . . . ."[9]  As a result, it had no cause to determine if Golden had paid fully for all programming delivered by Warner prior to December 9, 2002.

The source of the parties' disagreement regarding the scope of the mandate is the fact that if there was no breach of contract, as the Ninth Circuit held, no contract damages are available. The court believes that when the Ninth Circuit stated that "there was no breach," it meant to convey that "the contract did not end *because of* a breach," not that as of December 9, 2002, Warner had "been paid [everything it was owed] for the programming it had supplied." *Id.* Otherwise, the Ninth Circuit would not have remanded so that the court could "make a damages determination based on Warner getting paid whatever was due for the performance it had rendered through December 9, 2002." The court believes the Ninth Circuit directed that if, prior to December 9, 2002, Golden had received programming for which it had not paid the fee due under the contract, the fees were be awarded to Warner.  Such an outcome would comport with the Ninth Circuit's view of the parties' respective obligations under the contract, which contemplated Warner's provision of programming in exchange for Golden's payment of fees.

The court also believes the Ninth Circuit anticipated that the specific amount of money owed, if any, would be calculated according to the contract, which set forth the prices Golden was to pay for the programming it received.  The circuit court viewed Warner's entitlement to damages as limited to payment for programming it had actually provided to Golden, and directed the court to assess the amount of damages it was owed under a restitutionary theory of relief.  See *id.* at 1071 ("Since the second term of the contract was already running, Warner had been

---

[9]FF/CL, ¶¶ 43-44.

7

performing its duties to supply programming, and the parties had agreed on the prices of the programming, *Warner was entitled to get paid for the programming it had supplied*" (emphasis added)); see also *id.* ("Yet, to reiterate, there was no breach.  Neither party had failed to perform its obligations under the contract.  *Warner supplied all products under the contract, and Golden paid for them*" (emphasis added)).  Although the language of the mandate is couched in terms of "performance" and contract damages, directing that the court "make a *damages determination* based on Warner getting paid whatever was due," the court is compelled to construe the mandate in light of the appellate court's opinion.  That opinion concluded that Golden had properly offered to tender an amount that would cover its remaining obligations under the contract, and that Warner had properly "supplied all products under the contract."  *Id.*  It remanded so that the court could determine whether Warner had been paid for all of the programming it had delivered  to Golden.  This direction limits the scope of the mandate, and requires that the court conduct what is essentially an unjust enrichment/restitutionary analysis.    See *McBride v. Boughton*, 123 Cal.App.4th 379, 387–88 (2004) (unjust enrichment is not really a cause of action but rather a basis for restitution, citing *Melchior v. New Line Productions, Inc.*, 106 Cal.App.4th 779, 793 (2003) (stating that unjust enrichment is not a cause of action but rather "a general principle, underlying various legal doctrines and remedies. . . .  It is synonymous with restitution" (internal quotation marks omitted)).

This conclusion, however, does not compel acceptance of Golden's argument that it too is entitled to restitution.  While the mandate clearly directs the court to assess the damages, if any, owed to Warner, the parties dispute whether Warner was actually owed money under the contract as of December 9, 2002, since it drew down fully on the $5 million letter of credit.  If Warner is owed less than $5 million for its performance under the contract, Golden contends it should receive the difference.  Golden cites a number of cases for the proposition that the court has inherent equitable authority to award restitution on remand, notwithstanding the specific language of the mandate and its silence on the subject of restitution.  See *Caldwell v. Puget Sound Electrical Apprenticeship and Training Trust*, 824 F.2d 765, 767 (9th Cir.1987) ("Well established principles of restitution permit a court, after being reversed, to order restitution"); *PSM Holding*

*Corp. v. National Farm Financial Corp.*, 743 F.Supp.2d 1136, 1140-41 (C.D. Cal. 2010) (discussing Supreme Court and Ninth Circuit cases that address the court's inherent authority to order restitution following the reversal of a judgment on appeal). These cases concern the court's equitable power to restore "[w]hat has been given or paid . . . when [the court's] judgment has been set aside and justice requires restitution." *United States v. Morgan*, 307 U.S. 183, 197 (1939); see also *Hinchman v. Ripinsky*, 202 F. 625, 627 (9th Cir. 1913) ("As it respects the restitution awarded by the District Court, that was a relief very properly granted, under the condition of the record at that time. The decree of the trial court stood reversed and annulled, and the appellant was entitled to have that returned to him which was taken away by an erroneous judgment. . . ," citing *Northwestern Fuel Co. v. Brock*, 139 U.S. 216, 220 (1891)).

These cases arise in a very different context, however, as they concern a party's right to restitutionary recovery of losses resulting from execution of a reversed judgment. Golden does not assert that Warner has been unjustly enriched by executing on a judgment that was reversed, or that funds it obtained in satisfaction of the judgment should be returned. Rather, Golden contends that Warner received monies it was not due under the parties' *contract*. Warner's receipt of the money had nothing to do with the court's eventual entry of judgment in its favor, and instead arose from conduct that took place before the case began. Consequently, the authority Golden cites is inapposite.

Having waived its right to appeal the entry of judgment in Warner's favor on its counterclaims, and unable to provide any authority supporting the view that it is entitled to restitution under the circumstances of this case, Golden has no basis for seeking the return of any excess funds Warner obtained when it drew down on the letter of credit.[10] Indeed, it is not clear

---

[10]Golden does not dispute that it failed to appeal the court's entry of judgment in Warner's favor on its counterclaims. (Golden Channels Response Brief at 3 ("Golden did not need to appeal its Counterclaim for this Court to consider awarding it restitution of money . . .").) Additionally, Ninth Circuit law is clear that arguments that are not raised and presented in a party's opening brief on appeal are waived. See *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009) ("The district court also granted summary judgment to the defendants on Ramirez's claim that the blood test performed at the police station following his arrest constituted an unreasonable

how the Ninth Circuit could have given such a direction, since Golden did not appeal the judgment on its counterclaims and the only matter addressed in the opinion was the judgment entered on *Warner's* claims.  While Golden couches its argument in terms of the court's inherent power to "do justice" following the appellate court's issuance of the mandate, proceeding as Golden advocates would essentially permit it to revive its restitution claim despite the court's entry of judgment on the claim and Golden's failure to appeal.  The court is not permitted to revisit its determination regarding the counterclaims, and Golden's arguments to the contrary are not convincing.  See *Nissan Fire and Marine Ins. Co. Ltd. v. Bax Global Inc.*, No. C 02–2516 JSW, 2009 WL 1364870, *3 (N.D. Cal. May 12, 2009) ("Pursuant to the mandate rule, a district court cannot 'revisit its already final determinations unless the mandate allowed it,'" quoting *In re Sanford Fork & Tool Co.*, 160 U.S. at 255).

Interpreting the mandate in light of the Ninth Circuit's opinion, the court concludes that it is authorized to determine the damages, if any, to which Warner is entitled for programming it provided through December 9, 2012, the date on which it validly exercised its right to terminate the contract.  It further concludes that the mandate does not permit it to award restitution to Golden, even if it transpires that Warner was entitled to less under the contract than $5 million, the amount of the letter of credit it drew down.

## B.    The Amount of Damages Owed

The court thus turns to the task the Ninth Circuit directed it to perform – determining the damages Warner should receive in order "to get paid for the programming it had supplied." *Warner Bros.*, 522 F.3d at 1071.  In making this calculation, the court looks to the fees set by the contract, given the Ninth Circuit's conclusion that the parties had a valid contract until Warner exercised its termination rights.

Warner seeks (1) the $500,000 extension option fee; (2) $1,115,312 in Year 3 license fees; (3) $1,066,117 in DTH carriage fees; (4) $2,872,478 in Year Four, first quarter license fees; and

---

search.  Because Ramirez does not address this issue in his opening brief, we deem it waived"); *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007) (holding that an argument raised for first time at oral argument had been waived).

(5) $530,000 in interest on late payments, or a total of $6,083,907.[11]  Golden does not dispute that it owes the extension option fee, a portion of the Year 3 license fees, DTH carriage fees, and interest on late payments.[12]  The parties' dispute focuses on two issues: whether Warner is entitled to approximately $2.8 million in Year 4 license fees, and whether Warner is entitled to the entire $1.115 million in Year 3 license fees given Golden's assertion that Warner did not provide all of the programming due in Year 3.  The court addresses each issue in turn.

### 1.    Warner's Entitlement to Year 4 License Fees

Warner contends that under the express terms of the contract, the license payment for the first quarter of Year 4 was due December 1, 2002, approximately one week before it terminated the contract.  It asserts that at that point, it had fulfilled its only obligation under the agreement relative to Year 4, which was to give Golden a list of available Year 4 programming from which Golden was "obliged" to make selections.[13]

Warner cites paragraph 5.d of the agreement's "Additional Terms and Conditions," which states:

"All License Fees are to be paid when due without regard to delays in the date of Transmission of any Program because of . . . Warner's exercise of any of its rights under this Agreement.  Timely payment is of the essence of this Agreement.  Licensee's failure to make any payments when due shall constitute a material

---

[11]Warner Opening Brief at 8.  Warner also claimed an entitlement to $586,046, based on Golden's failure to provide tax certificates as required by the license agreement.  (*Id.*)  The parties agree that Golden eventually produced the tax certificates and evidently no longer owes this amount to Warner.  (*Id.* at 9.)  The court therefore does not include this amount in the damages determination.

[12]*Id.*; Golden Response Brief at 6-9.

[13]License Agreement ¶ 3.4 ("Where in respect of Renewal Series, Library Series, Re-Run Series and Special Programs, Licensee is obliged to select Programs, Licensor shall send to Licensee no later than 1 July in each Year a list of programs and Licensee shall give Licensee written notice of its selection from that list no later than 1 August of that Year").  Golden had not made its Year 4 selections by the time Warner terminated the contract on December 9, 2002. (Trial Tr. 280:14-17.)

default hereof."[14]

As it is undisputed that Warner sent Golden the programming list in the summer of 2002,[15] Warner contends it fully performed its obligations under the license agreement and triggered Golden's obligation to pay Year 4 first quarter license fees in full on or before December 1, 2002.

Golden argues that Warner's argument is foreclosed by the Ninth Circuit's reasoning and mandate, as that court concluded that Warner expressed a clear intent not to supply any Year 4 programming due to the parties' inability to agree on the type of security that would be provided for the second term.   See *Warner Bros.*, 522 F.3d at 1066 ("Golden faced termination in December, had not agreed with Warner upon new terms, and had a letter of credit that would be outstanding until the following July. . . .   Warner concluded that more negotiations would be fruitless, so on December 9, 2002 it told Golden that it was terminating the contract, stating that Golden 'materially breached the License Agreement by failing to pay license fees when due'"). Golden argues that because the Ninth Circuit held that security for the contract's second term was an implied condition of Warner's performance, when Warner terminated the contract its right to be paid for any Year 4 programming also ended.

As noted, the court interprets the mandate as directing that Warner receive payment for the "programming it had supplied" under the contract prior to December 9, 2002.  The mandate did not contemplate an award to Warner untethered to its provision of programming.   The court specifically stated: "Since the second term of the contract was already running, *Warner had been performing its duties to supply programming*, and the parties had agreed on the prices of the programming, *Warner was entitled to get paid for the programming it had supplied*."  *Warner Bros.*, 522 F.3d at 1071 (emphasis added).   Golden contends that this statement limits the Ninth Circuit's direction that "Warner [be] paid whatever [it] was due for *the performance it had rendered* through December 9, 2002."  *Id.* (emphasis added).   Stated differently, Golden asserts that the "performance [Warner] had rendered" is equivalent to the "programming [Warner] had

---

[14]Additional Terms and Conditions, ¶ 5.d.

[15]Trial Tr. at 642:5-17; 1194:8-1197:3.

12

supplied."

The majority of Warner's rebuttal to this argument is premised on the notion that the court must award damages strictly pursuant to the contract. The court has already concluded, however, that the mandate contemplates a restitutionary type of remedy that ensures Warner receives payment for programming it delivered prior to December 9, 2002. This would not include Year 4 programming because it is undisputed that none of that programming had been delivered as of December 9, 2002.[16] Although Warner argues that it had provided a programming *list* to Golden – and that this was all it was required to do to trigger an entitlement to Year 4 first quarter license fees – the Ninth Circuit directed that Warner receive payment for programming supplied, not programming to be supplied in the future. While the provision of a programming list may be related in a general sense to the provision of programming, the contract's purpose was not to provide programming lists, but rather programming itself. This was the Ninth Circuit's understanding of the contract, and it repeatedly tied Warner's entitlement to monetary relief to the performance of its obligation to supply *programming*, not responsibilities ancillary thereto. The court thus cannot conclude that the mere provision of a programming list constitutes "performance" that entitles Warner to restitutionary payment of Year 4 first quarter license fees.

Warner's best argument is based not on the contract, but on Golden's conduct. As the parties' negotiations were breaking down, Golden's actions suggested that it believed it owed Year 4 first quarter license fees by tendering $5 million to Warner. Golden repeatedly cites the Ninth Circuit's statement that it did not breach the contract in this regard. *Warner Bros.*, 522 F.3d at 1071 ("Since the second term of the contract was already running, Warner had been performing its duties to supply programming, and the parties had agreed on the prices of the programming, Warner was entitled to get paid for the programming it had supplied. *The district judge did not find any inadequacy of amount in Golden's tender as of the time it was made, and did not find a breach by failure to pay amounts owed as they became due. Neither side breached*, they just

---

[16]FF/CL, ¶ 167 (discussing the Year 4 programming for which Golden would have been required to pay, had it been provided).

1    failed to reach agreement on a new term, and continued performance was conditional on

2    agreement." (emphasis added)).   Although at trial Golden disputed the specific amount due

3    Warner on December 1, 2002,[17] it did not dispute that license fees for the first quarter of Year 4

4    were due on that date.[18]   The Ninth Circuit's conclusion that no breach had occurred as of

5    December 9, 2002 thus appears to have been predicated on Golden's payment of all fees that had

6    come due as of that date.   Warner notes that Golden cannot argue that its tender of payment,

7    which included Year 4 first quarter license fees, demonstrates that it performed its contractual

8    obligations by "pay[ing] amounts owed as they became due," and then assert on remand that it

9    had no obligation to make that payment.

10        While the court recognizes that there is some tension in the various positions Golden has

11   taken, they can be reconciled when the parties' negotiations are put in proper context.   Golden

12   notes that at the time it tendered payment, it was under the assumption Warner would continue

13   performing its contractual obligations by, *inter alia*, delivering Year 4 programming.[19]   On

14   November 26, 2002, Golden stated that it would tender $5,083,301 in exchange for return of the

15   letter of credit.   *Warner Bros.*, 522 F.3d at 1066.   It acknowledged that it understood the

16   November 15, 2002 notice of default required it "to perform all of its obligations according to the

17   _____

18        [17]*Id.*, ¶ 151.

19        [18]*Id.*, ¶ 153.

20        [19]This suggestion is somewhat inconsistent with the Ninth Circuit's description of the facts:
21   See *Warner Bros.*, 522 F.3d at 1065-66 ("By now it had been clear for several months that Golden
     did not propose to maintain a $5 million letter of credit during the extension term, and Warner
22   proposed to insist on it.   At this point, Golden faced termination in December, had not agreed with
23   Warner upon new terms, and had a letter of credit that would be outstanding until the following
     July.   The contract had obligated Golden to keep a letter of credit in place until May 31 2002
24   'only,' the bank ran the letters of credit from July to July, and by not cancelling with the bank
     while negotiations were going on, Golden had allowed the letter of credit to run until July 2003.
25   Golden proposed to pay and be done with it").   Golden's position nonetheless finds support in the
26   record, as its tender specifically stated that it would "consider any suspension of programs
     delivery . . . if [it] occurs as a material breach of the agreement by Warner," and that it
27   "reserve[d] any and all rights and remedies it may have at law and equity."   (Golden Response
28   Brief at 13; Trial Exh. 20, ¶¶ 3-4.)

original Agreement."[20]  Golden contends that although it included Year 4 first quarter fees in the tender, the court previously found that on the date Warner issued a notice of default, it had no right to demand payment of the Year 4 fees because they had not yet come due.[21]  This is true. The court concluded that while Year 4 first quarter license fees later came due on December 1, as of the date Warner issued the notice of default, they had not.  It therefore found that Golden had met its outstanding payment obligations as of the date it tendered to Warner, and that the fact that it *chose* to tender an amount greater than what it owed did not mean it was *contractually required* to make such a payment.  This does not speak to whether Golden became obligated to make the payment on December 1, 2002, however.  While, if the court were enforcing the literal terms of the contract, the answer to that question would be yes, the Ninth Circuit's mandate instructed the court to award restitutionary relief for programming Warner had supplied, not for programming that was supposed to be supplied, but never was.

Under the Ninth Circuit's mandate, because Warner never supplied Year 4 programming to Golden, the court concludes that it would be inappropriate to award Warner damages equivalent to Year 4 first quarter license fees.

### 2.   Remaining Questions Regarding the Damages Calculation

Golden raises an additional argument regarding the payments owed for Year 3.  In its findings of fact and conclusions of law, the court concluded that Golden owed Warner $1,115,312 in Year 3 license fees.[22]  Golden asserts that this calculation was incorrect, since it was based on the price per episode multiplied by the number of episodes produced by Warner, not the number of episodes Warner delivered to Golden.  Golden asserts that Warner failed to supply nineteen

---

[20]FF/CL, ¶ 149 (quoting tender offer letter)

[21]FF/CL at 53, Conclusion of Law 8 and n. 271 ("Golden offered to pay $5,000,000 upon return of the Letter of Credit.  This was more than the past due sums Warner demanded in its notice of default, as the License Agreement cannot be read to allow Warner to issue a notice of default for Year 4 license fees more than two weeks prior to the time the December 1 payment was due").

[22]FF/CL, ¶ 164.

episodes of four television programs.[23]   It also contends that Warner failed to provide approximately $214,500 of programming for Year 2, i.e., thirteen episodes of *Breaking News*.[24] Golden estimates that the total value of the programming Warner failed to provide was $450,450, and argues that this sum should be subtracted from the approximately $1.1 million in Year 3 license fees.

Golden relies on Exhibit 785, a spreadsheet that details the individual television programs licensed, number of episodes produced by Warner and delivered to Golden, the per episode fee, total fees for all episodes, and Golden's payments to Warner for each program.[25]   Warner does not dispute that it did not provide the programming at issue, but contends that the license agreement "obligated Golden to pay the entirety of the Year 2 and Year 3 license fees when they became due, irrespective of the date of delivery of programming."[26]   Once again, therefore, the parties' dispute centers on interpretation of the Ninth Circuit's mandate.   Golden relies on the circuit court's statement that Warner is entitled to payment for programming it provided.   *Warner Bros.*, 522 F.3d at 1070-71.

Just as Warner is not entitled to Year 4 license fees because it failed to deliver any Year 4 programming, Golden is not entitled to restitution of any overpayment of Year 2 and Year 3 license fees Warner obtained by drawing down on the letter of credit.   Under the mandate, Warner is entitled to the $500,000 extension option fee, $1,115,312 in Year 3 license fees, $1,066,117 in DTH carriage fees; and $530,000 in interest on late payments.   This totals slightly more than $3.2 million.   Having drawn down the $5 million letter of credit, Warner has received all monies to which it is entitled and more.   The parties' debate regarding the $450,450 in fees for Years 2

---

[23]Golden Response Brief at 8.

[24]*Id.*

[25]Trial Exh. 385.

[26]Warner Bros. International Television Distribution's Supplemental Brief in Response to March 22, 2012, Court Order and June 25, 2012, Tentative Ruling ("Warner Supplemental Brief"), Docket No. 510 (July 9, 2012) at 2-3.

and 3 is therefore immaterial, as Warner has already obtained all the compensation it is due under the Ninth Circuit's mandate, and Golden, by virtue of its decision not to appeal the judgment entered in Warner's favor on its counterclaims, has no entitlement to restitutionary relief. Accordingly, each party has received all of the relief to which it is entitled under the Ninth Circuit's mandate.  The court expressly held that neither party had breached the contract, and that the contract simply terminated upon the parties' failure "to reach agreement on a new term." *Id.* at 1071.  It directed that Warner receive payment "for whatever was due for the performance it had rendered through December 9, 2002."  It did not direct that Golden receive restitution for overpayments it had made because Golden did not appeal the court's judgment on its counterclaims.  *Id.*

### 3.    Warner's Entitlement to Other Forms of Restitution

There is one last point of dispute between the parties.  Although Warner maintains that the Ninth Circuit's mandate requires that the court award contractual damages, it proposes two alternative means by which the court could estimate the value of the programming it delivered to Golden.  It contends that if the court employs a restitutionary measure of damages, these alternative means must be considered.

Warner divides the damages chronologically, and contends the court should award restitution based on (1) the value Golden derived from Warner's programming prior to termination of the License Agreement on December 9, 2002, and (2) the value Golden derived from Warner's programming subsequent to December 9, 2002.

### a.    Warner's Pre-Termination Damage Estimate

For the period prior to December 9, 2002, Warner contends the court should estimate the value of the programming by looking to the fees set by contract,[27] and places that value at $3,211,429.[28]  Warner argues that these damages are properly awarded because they represent

---

[27]*Id.* at 10-11.

[28]*Id.* at 11.  Warner does not explain the calculation by which it arrives at this sum. Golden's brief, though, references the same sum and states that it was calculated as follows:

what Golden considered the fair market value of the programming and other benefits Warner delivered to Golden under the contract.[29]

Although Warner does not explain how it arrived at a value of $3,211,429 for pre-December 9, 2002 programming, it appears the sum consists of the $500,000 extension option fee; $1,066,117 in the D.H. carriage fees for Years 1-3; $530,000 in interest for late license fee payments; and $1,115,312 in Year 3 license fees.[30]  As noted, Warner has already received this amount of "pre-termination" damages by drawing down on the $5 million letter of credit. Consequently, the court need not opine at length on the validity of its calculation.

> **b.**   **Warner's Post-Termination Damages Estimate Based on the License Agreement**

The more significant part of Warner's argument is its theory that it should receive *additional* restitution for the period after December 9, 2002.  Warner notes that under the license agreement, Golden was required to return all programming Warner had delivered to it within five days of termination of the agreement.[31]  When Warner terminated the agreement on December 9, 2002, Golden had not yet paid the full contract price, and so had no ongoing right to retain or air Warner's programming.[32]  Nonetheless, Golden continued to air the programming.[33]  Warner contends Golden has been unjustly enriched by airing its programming when it was not authorized

---

1. The $500,00 extension option fee.
2. $1,066,117 in D.H. carriage fees for Years 1-3.
3. $530,000 in interest for late license fee payments.
4. $1,115,312 in Year 3 license fees. (Opposition at 7)

This figure is identical to Warner's calculation of the amount Golden owed as of December 9, 2002, less $2,872,478 in Year 4 first quarter license fees. (Opening at 8.)

[29]Opening at 10.

[30]Opening at 8.

[31]*Id.* at 11 (citing License Agreement, Additional Terms and Conditions ¶ 8.a).

[32]Reply at 12.

[33]Opening at 11.

to do so.

To estimate damages for this period, Warner proposes two possible measures of restitution. First, it proposes a restitutionary award based on the value of Year 3 programming.[34] Using this approach, Warner estimates that Golden has been unjustly enriched in the amount of $6,269,615.[35] Alternatively, Warner proposes that the court estimate Golden's post-termination unjust enrichment by looking to the statutory damages recoverable for copyright infringement.[36] Using this method, Warner contends that Golden owes between $21,390,000 and $106,950,000.[37] Neither of Warner's proposed restitution measures provides a reasonable estimate of the actual value of the benefit Warner conferred on Golden.

Warner first suggests that the agreed-upon price of Year 3 programming as reflected in the license agreement represents an accurate estimate of the value of that programming to Golden, and is thus an appropriate proxy for the amount by which Golden was unjustly enriched when it continued to air those programs.[38] Warner's calculations put the value of the Year 3 programming at $6,269,615.[39] It derives this number by subtracting from Year 3 license fees ($6,808,065) the cost of 89 hours of re–run programming the parties deferred to Year 4 ($538,450).[40] To this sum, Warner adds the $3,211,429 it contends is due for the pre-termination period,[41] costs of

---

[34]Opening at 12.

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]Opening at 11.

[39]*Id.* at 12.

[40]*Id.* at 12 n. 32. The court previously calculated the same figure as the cost of Year 3 programming Warner delivered to Golden. (FF/CL #164, p. 43)

[41]See part A. *supra.*

$194,069.45 and attorneys' fees of $2,165,606.49, for a total of $11,840,719.94.[42]  Subtracting the $5,000,000 letter of credit on which Warner drew down, and the $83,391 Golden already paid, Warner calculates that the total due under this measure of restitutionary relief is $6,757,418.94.[43]

There are at least two problems with this figure.  First, Warner double-counts the value of the Year 3 programming.  Its calculation of pre-termination damages includes the balance of Year 3 licensing fees,[44] after accounting for the fact that Golden had already paid $5,154,303 in Year 3 fees.[45]  Including the total license fees for Year 3 in a calculation of post-termination restitution means that Warner is being paid twice for Year 3 programming.[46]  Second, Warner

---

[42]Opening at 12.

[43]*Id.*

[44]See *supra*, Part A.

[45]The $1,115,312 Warner included in its pre-termination restitution calculation represents the total value of the Year 3 licensing fees, $6,808,065, less $5,154,303 Golden had already paid to Warner. (FF/CL # 164, p. 43.)

[46]Warner may intend to suggest that Golden received double the value of the programming because it aired the programs both before and after December 9, 2002. This argument would be consistent with Warner's assertion that Golden was required to pay for the Year 3 programming in full prior to December 9, and then was required to return it by December 14 following Warner's termination of the contract. By this logic, the price of Year 3 programming might be included in an unjust enrichment calculation twice because Golden should have purchased the programming a second time if it wished to air it after December 9, 2002. At trial, Warner sought benefit of the bargain damages; it did not seek the return of its programming as it had earlier in the litigation. (See FF/CL at 82 n. 314.) On appeal, the Ninth Circuit did not address whether Warner was entitled to payment of future license fees because Golden had not returned its programming as paragraph 8.a of the Additional Terms and Conditions obligated it to do so upon "termination of the Agreement." (Additional Terms and Conditions, ¶ 8.a.) See *MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 127e (11th Cir. 1999) (". . . the idea here is that if PIC breached after the viewing season had begun, there would be no one left in Tampa to purchase MCA's programming and that as a result MCA would be unable to resell the programming in that market to make up the contract price. Assuming that this claim is correct as a factual matter, payment of the full contract price in the event of a breach would thus be the only way to protect MCA's expectation interest in the contract"). Nor did the mandate direct the court to consider the issue on remand. As noted, the Ninth Circuit directed that the court determine if

does not explain why attorneys' fees should be included in a calculation of the amount by which Golden was unjustly enriched. As Warner concedes elsewhere in its brief, its entitlement to fees and costs derives from the license agreement, and is premised on the conclusion that Golden "default[ed]";[47] it bears no evident relationship to the benefit Golden derived from having Warner's programming post-termination. Consequently, Warner's calculation of restitution based on Year 3 programming is flawed.

### c. Warner's Post-Termination Damage Estimate Based on the Statutory Damages for Copyright Infringement

Warner's second theory of restitution utilizes statutory copyright damages, rather than agreed-upon contractual prices, to estimate the value of the programming it delivered to Golden.[48] Relying on 17 U.S.C. § 504(c), Warner asserts that its programming should be valued at $750 to $30,000 per program, or up to $150,000 per program if Golden's infringement through continued airing is deemed willful.[49] Since each of the 713 programs Golden retained was unique and valuable, Warner urges the court to calculate the programming's value using the maximum statutory damages amount.[50] At this rate, Warner estimates the value of the programming at $21,390,000 if the infringement was not willful, and $106,950,000 if it was.[51] It contends the

---

Warner had been paid for the programming it delivered; it appears to have wanted the court to ensure that Warner had received the licensing fee set forth in the contract for programming it had delivered prior to December 9, 2002. It did not direct the court to award Warner damages arising from the fact that Golden had not returned the programming.

[47]Opening at 14.

[48]*Id*. at 12. Golden opposes use of this measure, citing the absence of any contractual breach on its part. Warner emphasizes that it does not currently seek damages under the Copyright Act, but "look[s] to the Copyright Act for guidance on an appropriate metric for evaluating the restitution Warner should receive for Golden's improper use of the programming post-termination." (Reply at 14.)

[49]*Id*. at 13.

[50]*Id*. at 14.

[51]*Id*.

court should use the higher figure because Golden indisputably acted willfully.[52]  After adding attorneys' fees and interest, and subtracting the $5,083,301 it already received by drawing down on the line of credit, Warner reasons that a copyright measure of the restitution to which it is entitled falls somewhere between $21,877,803.94 and $112,521,104.94.[53]

These damage figures are speculative and uncertain.  They are flawed for a more fundamental reason, however, which is that Warner adduces no evidence that copyright penalties represent the actual value of the programming Golden received.  It is undisputed that Warner did not assert copyright claims in this action, nor has it previously argued that copyright damages should be awarded.  Generally, "[s]tatutory damages are intended as a *substitute* for profits or actual damage," not as a tool to be used in estimating profit or damage.  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 520  (9th Cir. 1985) (emphasis added).  The measure of damages provided by statute is not necessarily a reflection of the actual value of the programming provided, since the purpose of the Copyright Act is both "to provide adequate compensation to the copyright holder and to discourage wrongful conduct and deter infringements."  *Kamar Int'l. v. Russ Berrie & Co., Inc.*, 829 F.2d 783, 786 (9th Cir. 1987) (quoting *Frank*, 772 F.2d at 520).  Thus, the Supreme Court has held that the Copyright Act allows courts, even in the absence of any benefit arising from infringement, to "impose a liability within statutory limits to sanction and vindicate the statutory policy."  *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 225 (1952).

For this reason, a large statutory damage award may be appropriate under the Copyright Act even if "it bears no relationship to the plaintiff's actual damages."  *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990).  A restitutionary measure of damages, by contrast, is usually based on "the reasonable value to the other party of what he received in terms of what it would have cost him to obtain it from a person in the claimant's position."  RESTATEMENT (SECOND) CONTRACTS, § 371 (1981).  The court cannot award damages to Warner

---

[52]*Id.*

[53]*Id.*

equivalent to statutory copyright damages where there is no evidence that such damages accurately approximate the value of the programming Warner delivered to Golden.

**C.      Whether the License Agreement Requires an Award of Attorneys' Fees and Interest in Favor of Either Party**

The final matter to be decided is the parties' respective entitlement to attorneys' fees and interest.  Both parties contend they are owed fees and interest under the contract or for other reasons.  Neither is correct.

Rule 54(d)(2) of the Federal Rules of Civil Procedure sets forth the procedure for seeking attorneys' fees.  It provides that a party seeking fees shall make a motion "unless the substantive law governing the action provides for the recovery of . . . fees as an element of damages to be proved at trial."  It does not, however, authorize the awarding of fees.  "Rather, it and the accompanying advisory committee comment recognize that there must be another source of authority for such an award . . . [in order to] give[ ] effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing such an award."  *MRO Communications, Inc. v. AT&T*, 197 F.3d 1276, 1281 (9th Cir. 1999).

"In the Ninth Circuit, state law governs applications for attorneys' fees in cases where a federal court exercises diversity or supplemental jurisdiction."  *Buena Vista, LLC v. New Resource Bank*, No. C 10-01502 CW, 2011 WL 3794904, *1 (N.D. Cal. Aug. 26, 2011) (citing *Mangold v. California Public Utilities Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995)).  Attorneys' fees are available under California law when a statute or contract provision so provides.  See *Reynolds Metals Co. v. Alperson*, 25 Cal.3d 124, 127 (1979); *Lerner v. Ward*, 13 Cal.App.4th 155, 158 (1993).

California law permits parties to allocate attorneys' fees by contract except where the issue of fees is specifically addressed in a statute.  See CAL. CODE CIV. PROC. § 1021 ("Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties");.  California Civil Code § 1717 provides that "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract,

shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. . . . Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit." CAL. CIV. CODE § 1717(a).   See also *Exxess Electronixx v. Heger Realty Corp.*, 64 Cal.App.4th 698, 706 (1998) ("If a cause of action is 'on a contract,' and the contract provides that the prevailing party shall recover attorneys' fees incurred to enforce the contract, then [reasonable] attorneys' fees must be awarded on the contract claim in accordance with [California] Civil Code section 1717"). The court determines which party, if any, has prevailed on the contract for the purposes of awarding fees. *Id.*, § 1717(b)(1).

Because "[t]he determination of whether there is a prevailing party is to be made 'on a practical level' after considering what each party accomplished via the litigation," the court must examine whether, given the posture of the case on remand, either party has achieved its litigation objective. See *ComputerXpress, Inc. v. Jackson*, 93 Cal.App.4th 993, 1017 (2001) (citations omitted)).

Warner contends that Golden is not entitled to attorneys' fees, as the Ninth Circuit ruled that "there was no breach," thereby depriving Golden of any grounds for seeking fees under the contract. As an initial matter, the court earlier ruled that paragraph 17 of the Additional Terms and Conditions[54] provides a basis for awarding fees to either Warner or Golden under Civil Code § 1717(a).[55] As a general matter, therefore, because the contract provided for the recovery of

---

[54]Additional Terms and Conditions ¶ 17 states:
"If Warner pays or becomes obligated to pay any sum of money, or does or is required to do any act which requires the payments of monies, or expends any sums for legal services of any kind or description by reason of any default of Licensee, then the sum(s) so paid or required to be paid, with interest thereon at the rate specified in paragraph 5.e., shall be added to the License Fees payable hereunder and shall be paid by Licensee to Warner concurrently with the next installment due, or, if there is no further installment due, Licensee shall make payment thereof on demand."

[55]Order on Motion to Strike at 5-8.

24

attorneys' fees, either party, if found to be the prevailing party, can recover fees.  Warner asserts, however, that because the Ninth Circuit held that both parties were performing under the contract and that neither breached, Golden cannot be a "prevailing party" as a matter of law.[56]  Similarly, because the court found against Golden on its counterclaims, and Golden did not appeal that ruling, the counterclaims cannot serve as a basis for a fee award.

Warner is correct only in part.  While Golden is not entitled to fees on its breach of contract counterclaim under § 1717(a), its ultimate success in defending against Warner's breach of contract claim may afford it a basis for recovering fees.  The California Supreme Court addressed a similar question in *Hsu v. Abbara*, 9 Cal.4th 863, 875-76 (1995).  There, plaintiffs sued defendants for breach of contract, alleging that they had failed to consummate a contract for the sale of their home.  *Id.* at 867-68.  The trial court found that no contract had been formed and ruled in defendants' favor.  The form real estate agreement at issue provided that "'the prevailing party [would] be entitled to attorney's fees and costs.'"  *Id.* at 866.  The trial court nonetheless denied defendants' request for fees.  *Id.* at 869.  On appeal, they argued that they should be awarded fees under § 1717 because they were the prevailing parties on the contract claim.  *Id.* at 868.

The Supreme Court reversed the trial court's denial of fees.  Although it noted that a trial court enjoys "a measure of discretion" under § 1717 to "determine that there is no party prevailing on the contract," *id.* at 876, it held that when an action culminates in a "simple, unqualified victory" for one party, the court has no discretion to deny that party fees by finding that neither party prevailed.  *Id.* at 877.  The Court stated:

> "[I]n deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by their pleadings, trial briefs, opening statements, and similar sources.  The prevailing party determination is to be made only upon final resolution of the contract claims

---

[56]Warner Reply Brief at 15-16.

1    and only by 'a comparison of the extent to which each party ha[s] succeeded and

2    failed to succeed in its contentions.'" *Id.* at 876.

3    Stated differently, "when the decision on the litigated contract claims is purely good news for one

4    party and bad news for the other . . . a trial court has no discretion to deny attorney fees to the

5    successful litigant." *Id.* "Thus, when a defendant defeats recovery by the plaintiff on the only

6    contract claim in the action, the defendant is the party prevailing on the contract under section

7    1717 as a matter of law." *Id.* (citations omitted).

8      The outcome in this case is not purely good news for one party and bad news for the other.

9    The Ninth Circuit concluded that the parties had a valid contract that neither breached, and that

10   the contract simply terminated shortly after its second term commenced.  Given this outcome, it

11   is clear that Golden achieved a significant victory on appeal, securing not merely vacation of the

12   judgment entered against it, but a decision that it had not breached the contract.  Like the

13   defendants in *Hsu*, it "defeat[ed] recovery by the plaintiff" on that claim.  For its part, however,

14   Warner "defeat[ed] recovery by [Golden]" on its contract counterclaim.

15     Section 1717(b)(1) states that "the party prevailing on the contract shall be the party who

16   recovered a greater relief in the action on the contract.  The court may also determine that there

17   is no party prevailing on the contract for purposes of this section." CAL. CIV. CODE § 1717(b)(1).

18   The decision whether "there is a prevailing party is to be made 'on a practical level' after

19   considering what each party accomplished via the litigation." *ComputerXpress*, 93 Cal.App.4th

20   at 1017. "[I]n determining litigation success, courts should respect substance rather than form, and

21   to this extent should be guided by 'equitable considerations.'  For example, a party who is denied

22   direct relief on a claim may nonetheless be found to be a prevailing party if it is clear that the

23   party has otherwise achieved its main litigation objective." *Hsu*, 9 Cal. 4th at 877; see also *Silver

24   Creek, LLC v. Blackrock Realty Advisors, Inc.*, 173 Cal.App.4th 1533, 1540 (2009) ("[T]he only

25   way to determine prevailing party status is by evaluating the parties' comparative litigation

26   success.  Thus, Silver Creek achieved its main litigation objective, while BlackRock clearly failed

27   to accomplish its desired goal even though it obtained the return of its deposit.  Although a trial

28   court has broad discretion to determine the prevailing party in a mixed result case, its discretion

26

is not unlimited.  The record indisputably shows that Silver Creek obtained the greater relief on the contract.  Accordingly, the trial court abused its discretion by finding neither party achieved greater relief on the contract and denying Silver Creek its attorney's fees under section 1717").

Under the unique circumstances of this case, it is difficult to conclude that either party achieved an unqualified victory.  See *De La Cuesta v. Benham*, 193 Cal.App.4th 1287, 1295 (2011) ("The reason the Legislature included the discretion clause in section 1717, of course, was obviously to allow trial courts to take into account the unique facts and circumstances of each case, as reflected in the 'totality' and substance language from *Hsu*.  So we will not attempt to fashion a one-size-fits-all rule").  Although Golden successfully defended Warner's breach of contract claim on appeal, in the underlying litigation *both* parties claimed the other was in breach, and asserted claims and counterclaims based on the contract.  *Warner Bros.*, 522 F.3d at 1067.  The Ninth Circuit concluded that neither party was entirely correct on the facts and the law, and that the contract simply ended as of December 9, 2002.  In so doing, it reversed the court's finding that Golden had breached the agreement but left undisturbed the court's judgment in favor of Warner on Golden's counterclaims.  Thus, neither party fully prevailed.  See *Hilltop Investment Associates v. Leon*, 28 Cal.App.4th 462, 555 (1994) ("Technically speaking, appellant was "a prevailing party" in that personal liability was not visited upon him on the concept of alter ego.  However, respondents were also prevailing parties in relation to the partnership over which appellant exerted control causing respondents to have to sue.  While the court found insufficient evidence to pierce the corporate veil, it did find that appellant was, in effect, the cause of the action taken by the partnership resulting in litigation. Under the circumstances the result was a draw . . . ."); see also *Hsu*, 9 Cal.4th at 875 ("[T]ypically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought" (emphasis added, internal quotation omitted)).

While the court found that Warner was entitled to approximately $3.2 million for programming delivered to Golden, Warner was already in possession of that sum because it had drawn down on the letter of credit.  It was ultimately unsuccessful in recovering the additional damages it sought when it filed this lawsuit.  Although California courts have held that jury

awards exceeding $1 million can confer prevailing party status, see *Ajaxo Inc. v. E*Trade Group, Inc.*, 135 Cal.App.4th 21, 59 (2005), the fact the court confirmed Warner's entitlement to $3.2 million in license fees is not sufficient to entitle it to fees as of right, given that it was already in possession of that sum and recovered no additional money in this lawsuit.  See *Sears v. Baccaglio*, 60 Cal.App.4th 1136, 1152 (1998) ("[E]ven though he recovered far less of the amount in controversy, the appellant contends his 'net recovery' of a relatively small judgment entitles him to attorney's fees as a matter of right.  This contention swims against the prevailing tide of authorities which have assumed section 1717's vesting of broad equitable discretion in the trial court.  The contention also ignores the express provision of section 1717 allowing the court to find that no party prevailed").

Similarly, the fact that Golden defeated Warner's claim for additional damages is not sufficient to entitle it to fees as a matter of right, given that the court entered judgment for Warner on Golden's breach of contract claim, the Ninth Circuit held that Warner had not breached the contract, and the court found that Warner had not been unjustly enriched so as to entitle Golden to restitution.  Given the unique procedural history of the case, the court simply cannot categorize either party as a "winner" or "loser."

Where, as here, neither party can claim total victory, California courts vest discretion in the court to deny fees to both.  See CAL. CIV. CODE § 1717(b)(1) ("[t]he court may . . . determine that there is no party prevailing on the contract for purposes of this section"); *Roden v. AmerisourceBergen Corp.*, 155 Cal.App.4th 1548, 1578 (2007) ("Here, '[s]ince the judgment 'must be considered good news and bad news as to each of the parties' . . . , we conclude the trial court's exercise of discretion was reasonable,'" quoting *Nasser*, 156 Cal. App. 3d at 60)); *Jackson v. Homeowners Association Monte Vista Estates-East*, 93 Cal.App.4th 773, 788 (2001) ("It should be clear from the foregoing that this was not a case in which there was a clear win by either side.  Both sides claim victory, and substantial arguments support both sets of claims.  Accordingly, we find that the issue falls within the trial court's broad equitable discretion.  No abuse of discretion has been shown, and the trial court's award of attorney fees to plaintiffs must therefore stand"); see also *Hartford Acc. & Indem. Co. v. J.R.L.A. Compliance, Inc.*, 904 F.2d

40, 1990 WL 74859, *4 (9th Cir. June 5, 1990) (Unpub. Disp.) ("Hartford's declaratory relief action was subsequently mooted when all claims by Customs were satisfied.  On the other side of the case, JRLA and Adler lost on all their counterclaims.  Thus, the judgment is good news and bad news for each of the parties"); *In re Tobacco Cases I*, 193 Cal.App.4th 1591, 1603 (2011) (reversing an award of attorneys' fees in favor of a party and remanding for application of the proper legal standard when "[t]he results . . . were mixed").  Compare *Kumar v. Yu*, 201 Cal.App.4th 1463, 1471 (2011) ("In the instant case, defendant successfully defended against plaintiff's claims; plaintiff failed to succeed in his contentions that defendant owed some amount as damages for breach of the Lease.  The result here does not qualify for a finding that there is no prevailing party on the basis that the judgment on the Lease claims is 'good news and bad news to each of the parties,'" quoting *Hsu*, 9 Cal.4th at 874)).  Because the Ninth Circuit concluded that neither party breached the contract – although both claimed the other had – and because neither Golden nor Warner can credibly claim to have fully accomplished its litigation objectives, the court does not believe that awarding fees to either party is appropriate.

Accordingly, the court finds that neither party is entitled to prevailing party status under the terms of the agreement or § 1717, and denies each party's requests for attorneys' fees and costs.  Furthermore, because the court has determined that neither party is entitled to further damages or restitution, both parties' requests for prejudgment interest are denied.

### III.  CONCLUSION

For the reasons stated, the court concludes that Golden is not obligated to pay Warner licensing fees for the first quarter of Year 4, in addition to the extension option fee, Year 3 license fees, and DTH carriage fees.  By drawing down on its $5 million letter of credit, Warner has received all the money to which it is entitled and the court's inquiry is at an end.   Both parties' requests for attorneys' fees and costs are denied.

DATED: January 18, 2013

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE